Mr. Fields for Sandersville and Mr. McMahon, you may begin when you're ready. May it please the Court, my name is Don McMahon. I'm here on behalf of Sandersville Railroad, which is led by Mr. Benjamin Tarbuten, who has moved, who is right behind us here today. We are here today to seek insurance coverage that Sandersville Railroad bought as a responsible but small corporate citizen who was seeking to protect the public and its own employees when it went out and looked for a CGL policy, commercial general liability policy, that covered not only bodily injury to individuals other than its employees, but because it's a railroad and is under FILA, the Federal Employees Liability Act, would cover any injuries it might cause to its own employees in the way that other employers get to rely on workers' policies. So this is a slightly different than your typical CGL policy. This is, as Evanston labels it, a premier railroad policy. It is our contention that the case of Mr. Flowers, his claim against Sandersville Railway, should be covered under this policy. And, in fact, we believe that Evanston agrees with us that it is the claim of Mr. Flowers within the insuring agreement of the policy, but that their concern is not so much whether it's covered by the policy in the first instance, but that they can rely on an exclusion, the pollution exclusion, to knock the claim back out of coverage. If our decision in bituminous casualty versus advanced adhesive was still good law, there might be some merit to your argument. But the Georgia Supreme Court has changed all that now with its two opinions, Georgia Farm Bureau v. Smith and Reed v. Auto Insurance Company. And so, isn't this case pretty identical? Your Honor, we would say very much that this case is identical to bituminous, but I would respectfully question an underpinning of your decision, which is, is bituminous no longer good law? We contend that it is, in fact, good law, that it is entirely consistent with Reed and with Smith about how to read an insurance policy. The concern that the Smith court, that the Reed court stated, that the Georgia Supreme Court and Reed stated, was that in the underlying matter for Reed, whether the policy had been properly interpreted. And the concern that Reed had was that the courts below had come to the policy, and instead of going first where they should have, to the policy language, to apply Georgia state law as to how to read a policy, the OGCA 13-2-2 rules. Well, this pollution exclusion language has been interpreted much more expansively and broadly as a result of these two Georgia Supreme Court opinions. Am I wrong about that? No, sir, you are absolutely correct. But what those two decisions did is that they were interpreting one part of the pollution exclusion. In fact, they were not even doing that. They were interpreting the definition of pollution, and the term pollution is then used in the pollution exclusion. So Reed and Smith were both very clear that they were looking at the definition of pollution to see whether or not, on the facts of the cases before them, something was a pollutant. In Reed, the question is, is carbon monoxide that is released from an indoor heater a pollutant? And the answer was yes. And Reed said, we do not like these cases in other jurisdictions that say the purpose of the pollution exclusion is for traditional environmental pollution and then expound from the purpose and go from the purpose. So you're arguing that the welding fumes that injured Mr. Flowers were restricted to a confined space inside the rail cars, right? That is correct. So therefore, there's no pollution because there's no escape or there's no seepage, right? That is not quite our argument. Our argument is that the welding fumes are a pollutant. At the time that this all began, the Smith case had not yet come down, and so there was intermediate Georgia appellate court law a little different on that. You're not arguing that it's not a pollution because the fumes are confined to the rail car? We are arguing that although the fumes are a pollutant, that the pollution exclusion is not satisfied here because the pollution exclusion requires that you have a pollutant, but it also requires that the injury arises out of the discharge, dispersal, release, escape, seepage, or migration of that pollutant. It isn't simply that it's caused by. It's quite clearly it is not an effort to be caused by. It's different than these two Georgia Supreme Court opinions because in the Georgia Farm Bureau case, that involved the paint fumes, ingestion of paint fumes inside a home, and Reed involved a release of carbon monoxide in a home. Your Honor, I would. So in both of those cases, the fumes never moved beyond the confined space of the home, which is exactly what we have here in this case. But, Your Honor, it's a little bit different because in both of those Georgia Supreme Court cases, they were not dealing with whether or not there had been a release. In fact, in Reed, it was quite clear the party below, the tort claimant, had alleged a release because the release was from the heating unit, which should have been vented to the outside properly, into a home where it was not supposed to be. That means that there had been a release and it was no longer confined the way it was intended to be. But in any event, Reed was quite clear. You're saying that release has to be interpreted in light of its intention? I'm saying release has to be interpreted, well. I mean, there's no doubt that in the normal course of language, the fumes in this case were released. Otherwise, Mr. Flowers would not have been hurt, right? Well, I think that. They had to go from what he was doing into the atmosphere so that he would ingest them. They had to be released in the normal sense of the word. Is that not correct? I would say that that's not correct because that, among other things. Where did those irritants go? Well, the whole problem was that the irritants did not go. In his complaint, he alleged they did not disperse. Where did the irritants come from? The irritants came from a welding rod that, as he's sitting there welding, is directly in front of his face. So something, there's a chemical reaction. And from that chemical reaction, the irritant, the pollutant, is released. And that's what he ingests. Well, but, Your Honor, we need to, under Georgia rules of statutory contract interpretation, look at the entire policy. Other parts of the policy have exclusions for when you are exposed to, come into contact with, or inhale certain substances. That's not this part of the policy. So we know that this part of the policy, it's not enough. And, in fact, Evanston has never argued that there was a release. They may today now. But in their briefing below, they said there was a discharge and there was a dispersal. But in their first two briefs. Discharge or release, what's the difference between those things? Well, looking at bituminous, a discharge can mean several things, including an unloading or an explosion. Neither of which this is. But those aren't the exclusive possibilities for that word. Those are not the exclusive possibilities. If I empty this bottle of water, that's a discharge of water, is it not? I guess it could be a discharge. But what we're talking about is, in a policy, if there are two reasonable meanings. And so Your Honor is suggesting one reasonable meaning. But if there's another one that does not encompass it, that's a problem for the insurer who should have been more specific. And that is something that is in bituminous, following the rules of construction. That is how policies are constructed. So, for instance, here we have the asbestos exclusion. And the asbestos exclusion is much broader and says anything caused by asbestos. Caused by inhalation, contact with, touch, a whole list of things. And then in the middle they drop in the discharge, dispersal, release, escape. So that means that discharge, dispersal, release, and escape cannot be equated with a mere exposure. Okay, so tell me the definition that you would have us write in an opinion. The pollution exclusion in this case applies when? Well, and that's what we took some heat on underneath. But where we say that something moves from where it's supposed to be to where it's not supposed to be. But that is what is in common with the six pollution exclusion terms that makes it different from the greater number of terms in the asbestos exclusion. Because otherwise you're going to end up with a situation, they already have other policy language. For instance, there's a sort of terrorism related exclusion that says anything caused by a chemical that is used maliciously is excluded. They wouldn't need that. You wouldn't need to talk about malicious use if the pollution exclusion covered it. No, because you can have exclusions that have some overlap. That's not necessarily fatal. It's not fatal, but you would not need that exclusion if the chemical causing injury were already excluded by the pollution exclusion. It's not just some overlap. You don't need it at all. And that's not how policies are read because policies need to be read. I want to make sure I understand. So if you have a pollutant and it injures somebody, but the pollutant was where it was supposed to be, there's coverage and the exclusion doesn't apply. That is correct. That would be my argument here. But specifically in this context, Bituminous was right in how it looked at things. Bituminous did not do what it has been alleged by the court below to do, which is to find out the purpose of the pollution exclusion and then go forward. Bituminous went straight to the dictionary and used the rules of textual analysis, which is what we say should continue here, because Reed and Smith used the rules of textual analysis and the court below did not. I am, however, out of my time. I've saved five minutes for rebuttal and will come back then so I can give my colleague his time if you don't mind, sir. Thank you. All right. Mr. Fields. Thank you, Your Honors. May it please the Court. My name is Paul Fields and I represent Evangston Insurance Company in this matter. Your Honors, the district court properly granted summary judgment to Evangston in this matter based upon the Georgia Supreme Court authority. As noted by Your Honors, most recently, the Georgia Farm Bureau Mutual Insurance Company matter versus Smith. It's a 2016 Georgia Supreme Court case. Mr. Fields, those cases all involved a general liability policy, didn't they? That's correct, Your Honor.  Correct, Your Honor. Now, in this case, we have not just a general liability policy but additional provisions which provide coverage for injuries to the employees, specifically any claims under the Federal Employees Liability Act, right? That's correct, Your Honor. Nothing like that in any of those other cases, was there? That's correct. All right. Now, in this case, this additional coverage for the FELA gave the employer insurance for what is essentially a workers' compensation system under the Railroad Workers Act, correct? Except for the fact there's going to be negligence alleged against under FELA. And it's specifically included, as I note from reading the language, that it would cover any injury or let me just read it. It says that vital injury, first of all, is defined as including an occurrence which is an accident including continuous or repeated exposure to substantially the same general harmful condition. It also says that under the FELA coverage, it also covers injuries including occupational disease. Again, including injuries that arise during the course of the employment which involve continued exposure to harmful conditions. Now, you say that that coverage in this case is eliminated because of the pollution exclusion. Correct, Your Honor. So, I'm assuming that this additional coverage, this FELA coverage, was a risk that your client would have evaluated and charged a premium for them, right? I believe that's right, Your Honor. Probably a very substantial additional premium for covering claims under the FELA, right? I don't know the underwriting amount, but I assume there was additional coverage, additional premium. All right. Now, what I'm struggling to understand is just what did the employer get when he purchased coverage for injuries to employees arising out of the course of their employment, including occupational disease, which would include continued exposures to conditions. Here, we're insuring a railroad. I'm sure there are all kinds of irritants and harmful substances that the employees may be exposed to which could cause occupational disease, correct?  Can you think of any situation in which your FELA coverage that was paid for would apply if the pollution exclusion covers all of those things? In other words, what did the employer get for paying this additional money if you're excluding exposure to harmful conditions in the environment? What would you be covering? You would be covering if through touching something, through... That would cause an occupational disease? Hypothetically... I've been trying to think of the ones that I can think of, and I think of things like silicosis or congestive obstruction pulmonary disease by exposure to smoke and fumes in the work environment, silicosis, inhalation of exposure to dust and other kinds. But I can't think of... It seems to me that the majority of all of those occupational diseases would be caused by something that would fall within your pollution exclusion. Your Honor, I'm not going to dispute that there would be a large portion of occupational disease in the railroads that might be the result of the pollution exclusion. All right. Well, that's what I would think too. So what I'm wondering is, wouldn't it be reasonable for the railroad that bought this coverage for its employees to assume that this pollution exclusion, absolute pollution exclusion, here in the rest of the general liability policy would be intended to apply to those kinds of claims under the general liability policy, but not to the coverage extended, the special coverage extended for the FLA claims? No, Your Honor. Wouldn't that be a reasonable conclusion that he paid the money for it? So that the... Otherwise, he's not getting much for what he paid for, is he? Well, Your Honor, the district court actually dealt with that and it said the policy provides what the policy provides. The pollution exclusion as such... What I'm wondering is, would it be reasonable for a person who paid for this additional coverage for employees to think that, well, gee whiz, this absolute pollution inclusion, it must apply to something else and therefore, there's some ambiguity here. No, Your Honor, because there are exclusions in the policy that say this does not apply to FLA claims. The pollution exclusion contains no such limitation. It says it applies to pollution exclusions, period. But your FLA coverage is providing some, actually an additional form of insurance, isn't it? But the FLA coverage is subject to the exclusion for pollution. Okay. And nowhere in the pollution exclusion does it say we opt out exclusions for FLA claims. Right. Like other exclusions... many of the claims that would be, that I'm paying to have insurance for. Occupational disease claims arising out of exposure to contaminants and injurious substances in the atmosphere environment that my employees are exposed to. Like workers in a print shop or workers in a sawmill inhaling sawdust. As I said, silicosis, those kinds of things. Your Honor, to determine what your insurance policy covers, and we're not talking even about a homeowner. We're talking about a sophisticated business. You look at the policy and say, what does it say? And you can look at other exclusions in this policy and they will say that they are subject, that this is not subject to FLA claims. The pollution exclusion contains no such limitation. It applies. It is an absolute pollution exclusion. And if you take into account the... So what did the employer get for this additional premium? We got coverage for certain FLA claims, but it didn't get coverage for FLA claims. But not claims for... Well, you've answered my question. I mean, Your Honor, I don't mean to sound harsh, but I think that the Georgia law is pretty clear that if the terms of a policy are unambiguous, you have all the terms. Except the Georgia cases do not include any policy that includes additional coverage for workers and which covers injuries to workers in the sense of continued exposure to injurious elements. Your Honor, I will admit the Georgia Supreme Court has not addressed that exact issue. But in the Georgia Mitchell Smith case, in the Reed case, the Georgia Supreme Court has been pretty adamant that what you do is you look at the language of the policy and you apply the language of the policy. And that's the only place that you have to go. And the only place you have to go is to look at the exclusion. The Bituminous case, which is what the appellate relies upon, was issued, as Your Honors have correctly noted, was issued before the Reed case came out and subsequently the Smith case. But their argument, as I understand it, is a very technical one, but it's one that makes you think nonetheless. The argument is this. Bituminous dealt with the words release and discharge and found that those words were ambiguous. The subsequent Georgia Supreme Court opinions deal with the term pollutant and not with what release or discharge mean. Ergo, those two decisions do not affect the ambiguity holding of Bituminous. And finally, it follows that Bituminous still controls on the issue of what release and discharge means. What is the response? Judge Shorten, I would respectfully disagree. If you look at the status of the pollution exclusion law at the time Bituminous came down, there was a debate. I did a lot of these cases when I was a younger lawyer. There was pollution exclusions in insurance policies. And they would say, we do not insure pollution, but we will insure it if it was sudden and accidental. And this came into play in the 1970s. CERCLA came into play. Another large environmental risk started occurring. There was tremendous amount of litigation as to what does sudden mean. Does sudden mean abruptly? Or does it just mean unexpected and unintended? And that was debated. And the Georgia Supreme Court in the Claussen case in 1989 said, we're going to come down. And essentially, the country was split. It was 50-50. You would go to, you would pick Oregon would enforce a pollution exclusion. Georgia would not. When I say enforce, I mean that sudden has an abrupt meaning. So in 1989, Judge Clark issued the opinion. It was one of the first cases that came down and said, sudden does not have to have a temporal element. Because we are going to look at this, we're going to look at the language of the policy. That was focused on the methods of traditional pollution exclusion. So you would have a large landfill that was put in place. And I think this landfill that was in the Claussen case occurred just north of Jacksonville, Florida, down near Waycross. And did the pollution escape? So they're talking about traditional pollution. Now, that changed when in 1985, the industry started putting in absolute pollution exclusions. The Petumidas case was looking back and it followed the logic of Claussen. And I think this is very important. The judge in the Petumidas case, the court stated, the pollution exclusion clearly contemplates shielding Petumidas from liabilities associated with environmental contamination. Petumidas' contrary position that the clause excludes coverage for a consumer's claim for damages arising out of the intended use of the insured's product is a strained one. Now, but if you then said that, so Petumidas is saying, oh, we could never have when it's a consumer who is injured perhaps by lead paint or by carbon monoxide, that would never apply. And that's toward the end of the Petumidas decision. So that is the thinking that they are using when they are issuing the ruling. Well, in 2008, the absolute pollution exclusion is interpreted by the Georgia Supreme Court and they completely reject that analysis. It's a five to two decision. Justice Carley and Justice Huntsting dissented. But they say, nope, it says what it says. And we're going to apply it as it is written, essentially rejecting the traditional environmental pollution limitation that the Petumidas court relied upon to reach its decision. So if we then take that, and so it's a five to two decision and read, and then you go forward to the Smith case where the Georgia Court of Appeals actually went the other way and the Georgia Supreme Court came down 7-0 and said, no, you read the terms of the policy and you apply the terms of the policy as written. So, Judge Jordan, essentially I would say that the Petumidas case was based on a reading of traditional environmental pollution and Clawson, and in fact, it relied significantly on the court's decision at Clawson. That may be a way to read it, but there is also a different way of looking at Petumidas, and that is that it just applied the rule of ambiguity, which is still viable in Georgia law, that if a term is truly ambiguous in a policy, you construe it against the drafter, who is usually the insurance company. And the argument is that neither read nor Smith involved a determination of what release or disperse or discharge mean. But, Your Honor, I think . . . Are there any other cases in Georgia that have addressed the meaning of that, of those terms? Discharge . . . After read? No, Your Honor. I don't believe there's any other Georgia Supreme Court cases that have addressed . . . Not necessarily the Georgia Supreme Court, but the Georgia Court of Appeals, the Federal District Court . . . Yes, Your Honor, there is a Federal District Court case. It was from Judge Duffy, and it is racetrack petroleum. I believe, and I could be wrong, but I believe racetrack petroleum. And I will also, and I think that's cited in our papers, I'm trying to remember right now whether it's dealt specifically with those. I think the District Court got it right, and I recognize my time is up. But if you go back and read Judge Treadwell's decision, he goes, you don't have to look to a dictionary to determine what discharge, disperse, or release, escape means. I know, but the problem is that that's not what bituminous did. Bituminous did look at dictionaries to do exactly that. That's correct, and the Georgia Supreme Court says you don't have to anymore if the terms are unambiguous in the Georgia Farm Bureau Smith case. Thank you, Your Honors. Your Honors, thank you. If I may address a few points that have just been made. First of all, with regard to the bituminous court and the influence of the earlier Georgia Supreme Court decision, Clausen, Clausen did what bituminous did. Clausen did not rule on the ground that we've got something to do with pollution, so let's think about generally what we think pollution coverage could be. Clausen applies the strict textual analysis. It opened the dictionary and looked at Sutton and looked to see whether or not there was an ambiguity, which it then found there was, and it applied that rule of construction. So bituminous followed the same approach to follow what I believe Your Honors have suggested is a very technical approach. And indeed, the technical approach is then what the courts in Reed and Smith did, because they said, generally thinking, we can see why people, you know, might not think that lead paint in a house is a pollutant or carbon monoxide from a space heater, but we're going to look at the words, and the words pollutant are defined in these policies different than the general belief. So we're going to go with as they're used in the contract to be very broad, to be irritant and contaminant. Well, it is our view as an insured that that is a fine thing to do, but that we need to look at the entire pollution exclusion to consider if it applies. It is not enough to do, as we contend the district court did, just see that pollution is broad and make a declaration that the purpose of the pollution exclusion is to absolutely exclude claims for injuries caused by pollutants. That's at the order, which is docket entry 43 at 15. That is exactly what we've been accused of doing by Evanston trying to think of the purpose of the pollution exclusion. We are not doing that. We are looking at the exact words. And if you're going to have a very broad definition of pollutant in a policy that is supposed to apply by its ensuring agreement and definitions to exposures to substantially similar harmful conditions, then it is not surprising that other words in that exclusion may have a limiting effect. So they did not write a pollution exclusion that said we exclude all injuries caused by pollution. That is not what this says. That is what the asbestos exclusion essentially says by saying we have a very broad list of terms beyond the discharge, dispersal, release, escape, migration to include inhalation, contact, exposure to. Why do you think that the Georgia Supreme Court in Reed never mentions the rule of construction that an insurance exclusion should be given a narrow construction and construed liberally against the insurer unless it's clear and unequivocal? I do not know what was going through their head, but I think what they said is that it was clear and unequivocal that the definition of pollutant applied very, very broadly. And we at this point, after the Smith case came down, we have given up the argument about whether or not we're dealing with a pollutant when we're dealing with welding fumes. That is a pollutant. We are focusing on the other half of the language. This doesn't have anything to do with the case, but the welder, Mr. Flowers, did he recover damages from Sandersville Railroad? There was a settlement, yes. And Evanston was present but did not participate in funding of the settlement. And that's what you're ultimately trying to recoup within the policy limits? Yes, Your Honor. Okay. So I think the other point I might like to make is there was a discussion, I believe, by Evanston of a racetrack petroleum case which has a different pollution exclusion. And looking at that case, it expands much broader than does ours here to include coverage basically to exposures because you had individuals working at a gas station exposed to, I believe it was benzene. They could have written a policy like that. They chose not to. And so having made that choice, they do not under the rule of interpreting a contract as a whole, which is a statutory rule in Georgia under 1322 subpart 4, they cannot now make that here. So if there are no further questions. All right. No further questions. Thank you, Your Honor. In that event, court is adjourned.